**For Online Publication Only**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| |
|---|
| **UNITED STATES,**<br><br>             **Plaintiff,**<br><br>    **v.**<br><br>**OLGA MILMAN,**<br><br>             **Defendant.** |

**Case No. 16–cv–01110 (JMA)**
**98–cr–00842 (JMA)**

**OPINION AND ORDER**

**AZRACK**, U.S.D.J.,

Before this Court is a § 2255 motion and a petition for writ of error coram nobis filed by Olga Milman's ("Petitioner" or "Milman") that seeks to vacate a judgment of conviction entered against her in June 2000 for device access fraud.  (Docket Entry ("DE") 19.)  Petitioner alleges that she was denied her Sixth Amendment right to effective assistance of counsel because her attorney had a conflict of interest and provided ineffective assistance concerning the immigration consequences of her plea.  For the reasons below, her § 2555 motion and coram nobis petition are denied.

### I.  BACKGROUND

#### A.  Overview

Petitioner was born in Russia in 1970.  (Presentence Investigation Report ("PSR"), 98-CR-842 (JMA).)  She moved to the United States on a work visa in 1993.  (Id. ¶ 27.)  In 1994, she married Alexander Milman, a United States citizen, and they remained married until Alexander

Milman's death on September 12, 2015.  (Id.; Coram Nobis Pet. at 3, ECF No. 28; Immigration

Appeal Record ("IR") at 33, 369, Milman v. Barr, 19-2011 (2d Cir.), DE No. 18-2.[1])

Petitioner and Alexander Milman had two daughters:  Allison Milman born in 1995 and

Lilly Ann Milman born in 1998.  (PSR ¶ 28.)  Both daughters were born in the United States and

are U.S. citizens.  (Id.)

In 1997, Petitioner obtained a green card, becoming a Lawful Permanent Resident.

("LPR").  (PSR ¶ 28; IR32.)

Since becoming an LPR, Petitioner has been convicted in four separate criminal cases.  In

2015, while Petitioner was serving a five-to-fifteen-year sentence on state fraud and larceny

charges, the Department of Homeland Security ("DHS") sought to remove her and directed her to

appear before an Immigration Judge ("IJ").  While the details of each of these criminal cases and

Petitioner's immigration proceedings are explained infra, an overview of these cases and

Petitioner's immigration proceedings are set out below to provide helpful context.

In the instant case, Petitioner pled guilty in January 1999 in the Eastern District of New

York to device access fraud in violation of 18 U.S.C. § 1029(a)(5).  Petitioner ran a high-end

clothing store that she co-owned with an individual named Gary Rodzinski.[2]  At her guilty plea,

Petitioner admitted that she knowingly accepted counterfeit credit cards at her store.  She was

sentenced to probation in June 2000 and ordered to pay $107,000 in restitution.

---

[1]  The Court takes judicial notice of this filing from Milman's immigration appeal as well as certain other documents from Milman's immigration appeal and a 2005 criminal case in this District where Milman was convicted of filing a false tax return, (United States v. Olga Milman, 05-cr-658 (E.D.N.Y.)).  The Court's consideration of these documents is discussed further below.  (See infra n. 6 & 8.)

[2]  At certain points in the motion papers in this § 2255/coram nobis proceeding, alternative spellings of Rodzinski's name are used, including "Radzinsky" and "Rodzinsky."  The Court refers to him herein as "Rodzinski" except when quoting excerpts of the motion papers that use an alternative spelling.

As explained further below, Petitioner now claims, in this § 2255/coram nobis proceeding, that her attorney, Donald Vogelman, labored under a conflict of interest because he also represented Rodzinski. According to Petitioner, because of this conflict, Vogelman provided ineffective assistance in connection with her guilty plea, including giving her incorrect advice about the immigration consequences of this plea.

In 2000, Petitioner also pled guilty to Petit Larceny in state court.

In October 2005, Petitioner pled guilty in the Eastern District of New York to filing a false tax return. (United States v. Olga Milman, 05-cr-658 (E.D.N.Y.), ECF No. 11.) But Petitioner's sentencing was adjourned because she agreed to cooperate with the Government. In November 2005, Petitioner was stopped by Customs at JFK Airport after returning from a trip to the Dominican Republic. She was then "paroled" into the United States and directed to appear at a "Deferred Inspection" hearing in January 2006 because of her federal and state convictions from 2000. Petitioner proceeded over the next several years to cooperate with the Government in investigations related to health care fraud.

In 2009, the Suffolk County District Attorney's Office brought multiple charges against Petitioner, stemming from a scheme to defraud investors. In 2010, Petitioner was convicted, at trial, of multiple counts of Scheme to Defraud and Grand Larceny. She received an indeterminate sentence of five-to-fifteen years in prison.

In 2011, Petitioner was sentenced, on the federal tax charge, to 24 months in prison—a sentence which ran concurrent to her state sentence.

In April 2015, Petitioner—who was still incarcerated on her 2010 state convictions—received a Notice to Appear from the Department of Homeland Security ("DHS") that directed her to appear in immigration court. The Notice stated that DHS was seeking to remove her based on

3

her federal and state convictions from 2000, which DHS alleged constituted crimes of moral turpitude that rendered her subject to removal.

During these immigration proceedings, DHS sought to also remove Petitioner based on her 2010 state court convictions. However, because those convictions were still on direct appeal, DHS ultimately withdrew, without prejudice, its attempt to remove her based on those state convictions. Although some of those convictions were eventually reversed on appeal in August 2018, the Appellate Division still affirmed Petitioner's convictions for two counts of Grand Larceny in the Second Degree and one count of Grand Larceny in the Third Degree.

In March 2016, Petitioner brought the instant § 2255 motion that seeks to vacate her 2000 federal conviction for device access fraud. Petitioner claims that she received ineffective assistance of counsel because Vogelman labored under a conflict of interest as he also represented Rodzinski. Rodzinski allegedly paid for Vogelman's fees and was also a target of the investigation. In her § 2255 motion, Petitioner claims that the Assistant United States Attorney ("AUSA") on the case agreed to not indict Rodzinski if Petitioner pled guilty. Petitioner maintains that, because of this conflict, Vogelman wanted to ensure that Petitioner pled guilty and provided ineffective assistance that led to her pleading guilty. Petitioner claims, among other things, that Vogelman: (1) incorrectly advised her that pleading guilty to device access fraud would "probably not" result in her being deported; (2) failed to seek discovery before her guilty plea to ensure that the monetary threshold to commit device access fraud was met[3]; and (3) failed to argue, at sentencing, that Petitioner only played a minor role in the crime.

---

[3] The device access fraud statute only requires $1,000 loss. 18 U.S.C. § 1029(a)(5).

4

In March 2016, the Government opposed Milman's § 2255 motion on procedural grounds and on the merits.[4]

Petitioner's § 2255 petition was originally assigned to the Honorable Leonard D. Wexler. After Judge Wexler's passing in 2018, the case was assigned to the Honorable Sandra J. Feuerstein.

In February 2018, an IJ held a hearing where Petitioner testified. In April 2018, the IJ issued a decision ordering that Petitioner be removed from the United States based on her 2000 federal and state convictions. Although the IJ had the discretion to waive these convictions and prevent her removal, the IJ declined to do so considering all the circumstances, including Petitioner's lengthy criminal history. Petitioner appealed that decision to the Board of Immigration Appeals ("BIA"), which denied her appeal and ordered her removal. Milman's subsequent appeal to the Second Circuit was denied.

In December 2018, Petitioner filed the instant coram nobis petition seeking to vacate her 2000 federal conviction for device access fraud. In her coram nobis petition, Petitioner again claims that Vogelman provided ineffective assistance due to a conflict of interest and that he provided erroneous advice about the immigration consequences of her guilty plea for device access fraud.

While Milman's § 2255 motion and coram nobis petition were pending before Judge Feuerstein, Milman sought mandamus relief before the Second Circuit because her deportation was imminent. On February 19, 2021, the Second Circuit denied a writ of mandamus without prejudice with leave to renew if the district court failed to act within 60 days. The Second Circuit

---

[4] Milman's May 2016 reply brief does not appear as a separate entry on the docket. However, a copy of this reply brief was subsequently docketed as an exhibit to a later filing by Milman. (See § 2255 Reply Br., Scharf Aff. Ex. D, ECF No. 27-1.) The Court has considered this reply brief.

also denied Petitioner's request for a stay of removal without prejudice to that relief being requested in the district court.

On March 9, 2021, Petitioner moved for an emergency stay of removal. The Government did not file any opposition. On April 9, 2021, Judge Feuerstein died in a tragic accident. On April 20, 2021 this action was reassigned to me. That same day, I granted Petitioner's unopposed stay motion.

Further details about Petitioner's 2000 conviction for device access fraud—which is the subject of her pending § 2255 motion and coram nobis petition—and the other criminal and immigration proceedings involving Petitioner are set out below.

**B. Petitioner's 1998 Federal Criminal Case and 2000 Conviction for Device Access Fraud.**

In August 1998, Petitioner was charged with one count of device access fraud for her part in a fraudulent credit card scheme conducted at Via Della Spiga ("VDS"), a high-end women's clothing store. (PSR ¶ 37.) Petitioner was the President and 50% owner of VDS. (Id.) Her business partner Rodzinski owned the remaining 50%. (Id.) Petitioner invested $100,000.00 into the business venture and Rodzinski invested $200,000. (Id.)

On January 22, 1999, Petitioner admitted her involvement in the charged scheme and pled guilty before the Honorable Jacob Mishler to a violation of 18 U.S.C. § 1029(a)(5). (Tr. of Jan. 22, 1999 Plea Hearing ("1999 Plea Tr."), March 2016 Aff. of Olga Milman ("2016 Milman Aff.) Ex. B, ECF No. 20.) The maximum sentence for this offense was ten years. (Id. at 14.) At the plea hearing, Judge Mishler explained that Petitioner's plea agreement contained an estimated guidelines range of 10 to 16 months, which included a two-level reduction for acceptance of responsibility. (Id. at 19.)

At the time of her plea, Petitioner had completed high school and some college in Russia. (PSR ¶ 34; 1999 Plea Tr. 15.)  She was represented by Vogelman at the plea allocution and during plea negotiations.  (1999 Plea Tr. 1.)  During her allocution, Petitioner admitted that "[i]n 1997 . . . . at my business . . . I did enter into transactions using credit cards which I believed to be unauthorized, and as a result I did receive money in excess of one thousand dollars."  (Id. at 8). Petitioner admitted that "[p]eople came to the store and I did accepted [sic] the card and I released the merchandise for the payment of the credit card.  And I received the money from the credit card [company]."  (Id. at 9.)  Petitioner confirmed that she learned that the cards were being used without authorization, and that between March 1997 and September 1997—the time period charged in the Indictment—she knew that the transactions were not authorized.  (Id. at 13–14.)

Milman's plea agreement indicated that she faced "possible removal."  (Plea Agreement.) The immigration consequences of her conviction were also discussed at the plea hearing during the following colloquy:

THE COURT:  Now other penalties, possible removal. What does that mean?

MR. TATUM:  That she is subject to deportation, your Honor.  It doesn't mean that she will be deported.  We've also discussed that with her attorney, your Honor. They used to say deportation.  INS changed it to removal, meaning that she would be removed from this country.

MR. VOGELMAN:  Judge, just so the record is clear, I --

THE COURT: That a very important penalty that may be imposed.

MR. TATUM: That's correct.

THE COURT:  Instead of possible removal it usually says deportation. And under some circumstances where a crime is committed, the Court may direct that you be deported.

MR. VOGELMAN: Judge, I discussed this with Mr. Tatum and I know it's ultimately not our decision, or that it's the Court or Immigration, my client is married to a U.S. citizen.  She has two children here who are U.S. citizens.  And

we are going to discuss this further. I believe as her attorney that she – and there's no guarantees, that she probably will not be deported based on my understanding of the facts and circumstances of the case and certain conversations I've had with the government, even though we can't guarantee. But she has been explained that that is a possibility, Judge, and it could happen.

THE COURT:   But as Mr. Vogelman says, that's his prediction.   But you understand that the Court and the Court alone imposes sentence and all the conditions of sentence. Even if the lawyers agree that there should be no deportation, the Court can nevertheless deport you. Do you understand that?

THE DEFENDANT: I understand.

THE COURT: Of course the Court will take into consideration everything that Mr. Vogelman has said, but I just want you to think of the most adverse conditions that may be before you. That's why I am telling you all this.

THE DEFENDANT: Thank you.

(Plea Tr. 16–18.)

Although Milman pled guilty without a cooperation agreement, "[a]t or about the time of her guilty plea" she informed the Government that she wished to cooperate and to aid the Government in its investigation of credit card fraud. (May 31, 2000 Sent. Ltr. at 10, Scharf Aff. Ex. E, ECF No. 27-1.) The PSR prepared before her sentencing provides additional details below from the Government's investigation and Milman's proffers.

VDS featured high-end women's wear with an average dress retailing for $2,000. (PSR ¶ 37.) Four employees worked at the store. (Id.) Alexander Milman would also help out at times. (Id.) Milman maintained that she was rarely at the store, but called every day to discuss how business was doing. (Id.) She would also attend trade shows and order all the merchandise. (Id.) The PSR says nothing about Rodzinski's day-to-day involvement in the business.

During her proffer sessions, Milman admitted that she processed the fraudulent charges through the credit card terminal at her store to move inventory. (Id. ¶ 9.) Two individuals brought the credit cards at issue to her at the store. (Id.) Milman also admitted that, after the scheme began,

she subsequently agreed with one of these individuals to engage in "cash splits" where no merchandise was purchased, a fake sale was processed, and she and the individual who brought the fraudulent credit card would split the proceeds. (Id.) Agents reported that most of the charges were done after store hours. (Id.) Milman was present at the store during all the fraudulent charges. (Id.) The Government's investigation revealed $107,000 in losses from fourteen counterfeit credit cards. (Id. ¶ 2.)

On June 7, 2000, Judge Mishler sentenced Petitioner to three-years' probation with six months' home confinement. (ECF No. 18.) Petitioner was ordered to pay $107,363.16 in restitution.[5] (ECF No. 18.)

Judge Mishler's lenient sentence, which was issued before United States v. Booker, 543 U.S. 220 (2005), followed from a successful motion for a downward departure filed by Vogelman. Judge Mishler granted that motion and reduced Petitioner's offense level to 10 "based on the [Milman's] medical condition and her family ties and responsibilities[.]" (ECF No. 16.) At the time of sentencing, Milman's daughters were two and four.

Petitioner's motion for a downward departure also argued that a downward departure was warranted given her attempts to cooperate with the Government. (May 31, 2000 Sent. Ltr., Scharf Aff. Ex. E, ECF No. 27-1.) After pleading guilty, Petitioner attempted to cooperate with the Government in its investigation of credit card fraud. Petitioner spoke with two agents but was ultimately informed by the prosecutor that further cooperation from Petitioner was not needed.

---

[5] In addition to the $107,000 in losses stemming from the counterfeit credit cards, the PSR also recounted two incidents involving allegedly fraudulent credit card payments of $27,000 and $3,200 to a law firm. (PSR ¶¶ 6–8.) The PSR sought to hold Milman liable for the losses to the law firm for the purposes of the loss amount under the guidelines and for restitution. Judge Mishler apparently accepted one or more of defense counsel's arguments that the losses related to this alleged fraud should not be attributed to Milman.

(Id.)  Petitioner's motion notes that she did not initially cooperate, but ultimately agreed to do so because she "faced the possibility of incarceration."  (Id.)

Petitioner never appealed this conviction.

## C.  Petitioner's Other Convictions and Immigration Proceedings.[6]

### i.  2000 Petit Larceny Conviction.

In May 2000, Petitioner pled guilty to Petit Larceny in violation of N.Y. Penal Law 155.25, stemming from an incident at a retail store in October 1997.  (2016 Milman Aff. ¶ 10; IR32–33, IR75.)

### ii.  October 2005 Guilty Plea for Filing a False Tax Return.

On October 11, 2005, Petitioner and Alexander Milman both pled guilty in the Eastern District of New York to filing false tax returns in violation of 26 U.S.C. § 7206(1).  (Oct. 11, 2005 Plea Tr. ("2005 Plea Tr.") at 22–24, 05-CR-658 (E.D.N.Y.), ECF No. 11; Information, 05-CR-

---

[6]  The exhibits submitted by the parties contain certain documents from Milman's immigration proceedings.  Those immigration documents and other documents filed by the parties in the instant proceeding also reference three other criminal cases in which Milman was convicted of additional crimes—crimes that the IJ and the BIA also relied on in ordering Milman's removal.  Additionally, Milman § 2255 motion also included a copy of the 2015 Notice to Appear she received from DHS, which references her 2000 Petit Larceny conviction as well as the fact that, in November 2005 at JFK Airport, she was "paroled into the United States . . . for the purpose of deferred inspection."

Although Milman's other criminal cases, immigration proceedings, and 2005 encounter at JFK Airport are all potentially relevant to issues before this Court, the parties' filings provided incomplete documents and accounts of these proceedings and events.  As such, the Court has reviewed the dockets from Milman's 2005 federal tax case and Milman's immigration appeal to the Second Circuit (which contains a certified copy of the administrative record).  The Court can take judicial notice of these documents, see FED. R. EVID. 201, and some of these documents are, as explained below, admissible and relevant to certain issues in the instant proceeding.  For example, the mere fact that certain criminal proceedings occurred during the relevant time periods in question is, as explained below, relevant to certain issues.  Some documents—including the decisions of the IJ and the BIA and the exhibits that were before the IJ and BIA—are also relevant because they provide context to understanding those decisions and why the IJ and the BIA ultimately declined to exercise their discretion to not remove Milman.  Other documents from these two cases also contain relevant admissions by Milman in the form of her own sworn testimony before the IJ as well as statements and representations in briefings and other filings by her attorneys.  (Notably, none of the evidence submitted by Milman in her § 2255/coram nobis papers contradicts any of these admissions.)

The Court also stresses that, as explained below, even if the Court were not to consider any of these additional documents, the Court would—based solely on the record in 98-CR-842 and the exhibits provided by the parties in the instant case—deny Milman's § 2255 motion and coram nobis petition.

658, ECF No. 2; IR170.)  Notably, the defense attorney who represented Milman for this 2005 case was Jared Scharf—the same counsel who filed the instant § 2255 motion and coram nobis petition on Milman's behalf.  (2005 Plea Tr.)  Scharf began representing the Milmans in 2004. (IR75.)

At the October 2005 plea hearing, Petitioner pled guilty to filing a false tax return in April 2002 for the 2001 tax year.  (2005 Plea Tr. 23.)  Alexander Milman pled guilty to a filing a separate false return for the 2001 tax year.  (2005 Plea Tr. 23.)  The Information alleged that Petitioner reported only $60,000 income with $11,000 due in taxes when, in fact, she received income in excess of $523,000 with taxes due in excess of $190,000.  (Information, 05-CR-658, ECF No. 2; see also 2005 Plea. Tr. 33–34.).

In connection with pleading guilty to this tax crime, Petitioner entered into a cooperation agreement with the Government.  Because of her cooperation, Petitioner's plea hearing was sealed. (2005 Plea Tr. 4, 11; Def.'s July 5, 2011 Sentencing Mem. ("Tax Case Sent. Mem."), 05-CR-658, ECF No. 16.)  As explained below, due to her post-plea cooperation and subsequent state court indictments, trial, and convictions, Petitioner was ultimately not sentenced for her federal tax conviction until July 2011, more than five years after her guilty plea.

Petitioner's 2005 tax conviction appears to have had potential adverse immigration consequences.[7]  Petitioner has never claimed that she was unaware of this plea's potential adverse immigration consequences and has never alleged that she received deficient advice concerning the potential immigration consequences of this plea.  Despite the potential immigration consequences

---

[7]  At the time, it appears to have been unsettled in the Second Circuit and certain other circuits whether a conviction under 26 U.S.C. § 7206(1) that involved more than $10,000 in losses to the government could constitute an aggravated felony.  See Ki Se Lee v. Ashcroft, 368 F.3d 218, 225 (3d Cir. 2004) (holding, over dissent by then-Judge Alito that § 7206(1) could not qualify as an aggravated felony).  The Supreme Court ultimately held, in 2012, that a § 7206(1) conviction can qualify as an aggravated felony if the loss to the government exceeds $10,000.  Kawashima v. Holder, 565 U.S. 478 (2012).

of this plea, Petitioner pled guilty and did not go to trial. Petitioner did not appeal this conviction

and has never moved to vacate this plea.

> *iii. Milman's November 2005 Encounter with Customs and "Deferred Inspection."*

In November 2005, Milman left the country to go on vacation in the Dominican Republic.

(Dec. 8, 2005 Ltr., 05-cr-658, ECF No. 9; IR426.[8]) Upon her return to JFK Airport, she sought

admission to the United States as a returning LPR and was "paroled" in the United States for the

purposes of "deferred inspection." (2015 Notice to Appear, 2016 Milman Aff. Ex. C, ECF No.

20; IR290 (admitting to relevant allegations in the Notice to Appear); see also IR222; IR406).[9]

On December 8, 2005, Scharf filed a letter in the 2005 federal tax case about this incident.

(Dec. 8, 2005 Ltr., 05-cr-658, ECF No. 9.) According to Scharf's letter, Customs detained

Petitioner, confiscated her Russian passport, and ordered her to appear at a "Deferred Inspection

hearing scheduled for January 23, [2006]." (05-cr-658, ECF No. 9.) In the letter, Scharf states

---

[8]   The Court can take judicial notice of this letter filed in Milman's 2005 criminal tax case and can consider the admissions made by her attorney contained therein. The Court can also take judicial notice of other court and immigration filings made by her attorneys and as well as Milman's own sworn testimony contained in the certified administrative record filed with the Second Circuit. The Court can take judicial notice of these filings; the fact that Milman and her attorneys made the statements at issue "cannot reasonably be questioned," Fed. Rule. of Evid. 201(b)(2). These statements are also relevant and admissible because they constitute admissions made by Milman and her agents.

   The Court also notes that the admissions made in Scharf's December 8, 2005 letter (as well as the other admissions made by Milman and her attorneys cited herein) are not contradicted by any of the evidence Milman has submitted in support of her § 2255 motion and coram nobis petition. The Court assumes that these various admissions by Milman do not constitute binding judicial admissions. Nevertheless, these admissions are properly the subject of judicial notice, constitute relevant and admissible evidence, and can be appropriately considered here. See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (taking judicial notice of guilty plea and noting that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.") (quoting 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5106 at 505 (1977)); In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig., No. 305-MD-527, 2010 WL 1253891, at *1 (N.D. Ind. Mar. 29, 2010) (stating that "[c]ourt documents from another case may be used to show that the document was filed, that [a] party took certain position, and that certain . . . admissions were made" and taking judicial notice of admission defendant made in court filing) (emphasis added); Flint v. Beneficial Fin. I Inc., No. 12-CV-01675, 2012 WL 3277109, at *3 (E.D. Cal. Aug. 9, 2012) (taking judicial notice of admission by plaintiff in pleading filed in another case).

[9]   The record from the immigration proceedings also includes alleged documentation from this incident on November 28, 2005. (IR865–66.) Given Milman's admissions about this incident, it is unnecessary to determine whether the Court can rely on those documents.

that Milman "faces <u>possible removal</u> from the United States." (<u>Id.</u> (emphasis added).) Scharf requested a copy of the sealed plea hearing because he wanted to show Customs that Petitioner did not violate any travel restrictions since, at her plea hearing, the magistrate judge had permitted her to retain her passport and to travel abroad. (<u>Id.</u>)

In the instant § 2255/coram nobis proceeding, Petitioner submitted a copy of her 2015 Notice to Appear that explicitly references her 2005 "parole" and "deferred inspection" along with her federal and state convictions from 2000. (2015 Notice to Appear.) The 2015 Notice to Appear also implies that these two convictions were the reasons for her "parole" and "deferred inspection" in 2000.[10]

Notably, the papers Petitioner filed in support of her § 2255/coram nobis say nothing about Petitioner's 2005 guilty plea to the tax charge, her cooperation, or her interactions with DHS beginning in November 2005, which put her on notice that she was at risk to be removed for her 2000 state and federal convictions.

*iv. Milman's Cooperation and Sentencing in 2011 in the Tax Case.*

Milman cooperated with the Government from October 2005 through at least 2009. (IR379, 402, Tax Case Sent. Mem at 2.) Her cooperation involved posing as a Russian patient to uncover health care fraud. (IR379.)

In July 2011—after she was convicted and sentenced in 2010 in the state fraud and larceny case—Petitioner was finally sentenced by the Honorable Denis R. Hurley in the federal tax case. (Judgment, 05-CR-658, ECF No. 19.) In the tax case, the Government ultimately did not provide Petitioner with a 5K.1 letter given her state court conviction and alleged failure to disclose that

---

[10] Based on the 2015 Notice to Appear and Milman's various admissions, the Court draws the reasonable inference Milman was subject to this "Deferred Inspection" and was paroled into the United States in November 2005 <u>because</u> of her 2000 federal conviction for device access fraud and her 2000 state conviction for Petit Larceny. Milman has not offered any evidence suggesting otherwise.

fraud to the Government.  (Tax Case Sent. Mem. at 2; Gov't Sent. Ltr. at 1, 05-CR-658, ECF No. 17.)

At her July 2011 sentencing, Judge Hurley accepted Milman's plea and sentenced her to 24 months on her tax conviction and issued a non-binding recommendation to the Bureau of Prisons that this federal sentence run concurrent to her sentence on the state charges.  (Judgment and Docket Entry, 05-CR-658, ECF No. 19; Tax Case Sent. Mem. at 2, 8–10; see also IR381–84 (admitting to tax conviction).)  At sentencing, Milman was ordered to pay restitution of $179,143 to the IRS and $32,667 to New York State to account for the unpaid taxes for Petitioner's 2001 tax return.  (Judgment, 05-CR-658, ECF No. 19; 2006 Plea Tr. 27–28 (discussing restitution); IR284 (IJ decision referencing restitution); IR412–414.)

In 2012, while Milman was serving her sentences for her federal tax conviction and her 2010 state court convictions, she filed a FOIA request to obtain documents concerning her 1998 device access fraud conviction.  (2016 Milman Aff. Ex. A.)  Milman admits that she made this FOIA request "to obtain documents that would show the credit card transactions to establish a lesser offense, as opposed to a major moral turpitude felony for which one may be removed from the United States."  (2016 Milman Aff. ¶ 9.)  This admission shows that, years before receiving her 2015 Notice to Appear, Milman was concerned about the immigration consequences of her 2000 device access fraud conviction.

*v.  2010 State Court Convictions for Scheme to Defraud and Grand Larceny.*

In 2009, Petitioner was charged in two related indictments in state court.  (IR375, 377.) Scharf represented her during these state criminal proceedings.  (IR801)

14

The 2009 indictments charged Petitioner with committing a scheme to defraud and various counts of Grand Larceny in connection with this fraudulent scheme.  (IR33; IR834–851.)  The charges concerned conduct that occurred between April 2003 and August 2005.  (IR834–851.)

Petitioner went to trial in 2010 and was convicted of: (i) two counts of Scheme to Defraud in the First Degree; (ii) five counts of Grand Larceny in the Second Degrees; and (iii) one count of Grand Larceny in in the Third Degree.  (IR33; IR836, IR844.)  According to Petitioner's presentence report, which was introduced at her immigration hearing, Petitioner ran a company that offered temporary and permanent staffing services for data programming positions.  (IR616–18.)  Petitioner solicited funds from investors that were supposed to be used to fund payroll for the temporary staff.  (Id.)  Petitioner, however, used the money for other purposes and could not pay the investors back.  (Id.)  The presentence report included accounts of Petitioner's conduct from the victims of the scheme.  (Id.)

On these charges, Petitioner was sentenced, in December 2010, to multiple consecutive indeterminate terms of imprisonment from one to three years, which resulted in a total indeterminate sentence of five to fifteen years.  (IR33, 821, 831.)  Petitioner was also ordered to pay a total of $635,000 in restitution to the victims.  (IR61; IR425.)

Although Petitioner filed a timely notice of appeal, her appeals were treated as abandoned because she failed to promptly perfect her appeal or file a brief.  (IR831.)  However, in February 2014, the Appellate Division granted Petitioner's request for an extension of time to perfect her appeal.  (IR831–32.)  It appears that after DHS commenced removal proceedings against Petitioner in 2015, Petitioner eventually briefed her belated appeal to the Appellate Division.

On August 8, 2018, the Appellate Division vacated the two counts charging a scheme to defraud in the first degree and three counts of Grand Larceny in the Second Degree. People v.

15

<u>Milman</u>, 81 N.Y.S.3d 535, 536 (2d Dep't 2018).  The Appellate Division's vacatur of these convictions turned solely on statute of limitations issues.  <u>Id.</u>  The Appellate Division, however, affirmed Petitioner's convictions for two counts of Grand Larceny in the Second Degrees and one count of Grand Larceny in in the Third Degree.[11]  (<u>Id.</u>; IR836, IR844.)

As a result of Milman's appeal, some of the related restitution judgments against her, totaling $460,692, were vacated.  (IR31–32, 94–97.)  However, it appears that, even after her partially successful appeal, approximately $175,000 of the original restitution judgments against her from this case remained in force.  (IR31–32.)

After this direct appeal, Milman filed an unsuccessful application for a writ of error coram nobis in state court that sought to vacate her remaining convictions based on alleged ineffective assistance of appellate counsel.  <u>People v. Milman</u>, 131 N.Y.S.3d 278 (2d Dep't 2020).

*vi. Immigration Proceedings.*

On May 27, 2015, DHS served Milman with a Notice to Appear, charging that she was removable under Section 212(a)(2)(A)(i)(I) of the Immigration and Naturalization Act ("INA), codified at 8 U.S.C. § 1182, because her state and federal convictions from 2000 were crimes involving moral turpitude.[12]  (2015 Notice of Appear.; IR941; IR275.)  The Notice to Appear also cited Milman's encounter with Customs in November 2005 when she was paroled into the United

---

[11] Milman's remaining convictions appear to qualify as aggravated felonies, which would render her deportable under 8 U.S.C. § 1227(a)(2)(A)(iii) and 8 U.S.C. § 1101(a)(43)(G).  These convictions also appear to constitute crimes involving moral turpitude, which would render her inadmissible.  8 U.S.C. § 1182(a)(2)(A).

[12] Section 212(a)(2)(A) of the INA renders an alien inadmissible where the alien has been convicted of, or admits to, "a crime involving moral turpitude."  8 U.S.C. § 1182(a)(2)(A).

16

States for the purpose of deferred inspection.  (2015 Notice to Appear; IR941.)  Milman was directed to appear for a hearing was scheduled on September 10, 2015.[13]  (2015 Notice to Appear.)

On September 11, 2015, DHS added allegations charging that Milman was also removable due to her 2010 state court convictions.  (IR275, 827.)  In these additional allegations, DHS sought to remove Milman based on her 2010 state court convictions as she had now been convicted of: (1) additional crimes involving moral turpitude; and (2) two or more offenses for which the aggregate sentences imposed exceeded five years or more.[14]  (IR924.)  However, because Milman still had a pending direct appeal challenging the 2010 state court convictions, DHS eventually withdrew the new charges based on those convictions without prejudice.  (IR314.)

As noted earlier, on September 12, 2015, Alexander Milman died.

On February 26, 2018, Milman testified at a hearing before an IJ.  (IR345, 362.)  On April 17, 2018, the IJ issued a decision ordering that Milman be removed from the United States to Russia.[15]  (IR276–86.)  As explained in the IJ's decision, while Milman's 2000 federal and state convictions constituted crimes involving moral turpitude, Milman still qualified for the possibility

---

[13]  Notably, Petitioner's § 2255 motion included a copy of this Notice to Appear.  The affidavits that Petitioner submitted in support of her § 2255 motion and coram nobis petition, however, say nothing about her encounter with Customs in 2005 and Scharf's subsequent involvement with her "Deferred Inspection" hearing.

[14]  Section 212(a)(2)(B) of the INA renders an alien "inadmissible" where the alien has been convicted of "2 or more offenses . . ., regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more is inadmissible." 8 U.S.C. § 1182(a)(2)(B)

[15]  Criminal convictions can render alien either "deportable" or "inadmissible."  Different standards apply in determining whether particular convictions render an alien "deportable" or "inadmissible."  See 8 U.S.C. 1182; 8 U.S.C. 1227; Padilla v. Kentucky, 559 U.S. 356, 382 (2010) (Alito, J., concurring).  Given Milman's circumstances—including her trip to the Dominican Republic in 2005 and subsequent "parole" into the United States, along with the subsequent death of her husband and her attempt to adjust her status—the proceeding before the IJ and the BIA concerned whether Milman was inadmissible, rather than deportable.  (IR276–86; 2018 BIA Decision, Scharf Aff. Ex. F, ECF No. 27.)

of discretionary relief from removal under Section 212(h) of the INA, 8 U.S.C. § 1182(h).[16]
(IR280–86; see also 2018 BIA Decision.)  The IJ, however, ultimately declined to exercise this
discretion in Milman's favor given all the circumstances.  The IJ stressed Milman's multiple
criminal convictions, the almost $1 million in restitution judgments stemming from her various
convictions, and her repeated attempts to minimize her conduct.  The IJ also stated that Milman
failed to disclose her federal tax conviction, which "was kept hidden from the Court for almost
three years and was only divulged to it [at the hearing] in a manner in which [Milman] could
attempt to spin it as a positive."  (IR284; see also IR640–47.)  The IJ also found that although
Milman was her daughters' only living parent and separation is difficult, Milman's "separation
from them has been a fact of life for many years now," which resulted from Milman's own actions
that led to her lengthy incarceration.  (IR282.)

Milman appealed the IJ's decision to the BIA, which denied her appeal in a decision dated
October 12, 2018.  (2018 BIA Decision.)  While the BIA acknowledged the serious hardships
likely to befall Milman's children, the BIA agreed with the IJ that those hardships were outweighed
by Milman's past criminal activity, which included more than five convictions and over $950,000
in restitution.  (Id.)

Although the Appellate Division's decision vacating some of Milman's convictions had
been issued prior to the submission of her appellate brief to the BIA, Milman's counsel did not
provide a copy of this decision to the BIA.  (Id. at 2 n. 1.)  However, in February 2019, Milman
moved to reopen the proceedings before the BIA and brought the Appellate Division's decision to

---

[16]  It appears that Milman was able to surmount one initial hurdle to qualify for the possibility of discretionary relief
under Section 212(h) because she had left the country in 2005 and was subsequently paroled back into the United
States.  To qualify for the possibility of discretionary relief under Section 212(h), Milman also had to meet other
threshold requirements, which she was able to meet due to the death of her husband.  (IR281.)  Even if her husband
had not died, it appears that she could have also met one of the threshold requirements for a 212(h) waiver by showing
that her removal would "result in extreme hardship" to her children and her husband, who were all U.S. Citizens.
8 U.S.C. § 1182(h)(1)(B).

18

the attention of the BIA. (IR166–182.) This motion to reopen also pointed out that in March 2018 the Second Circuit had decided <u>Obeya v. Sessions</u>, 884 F.3d 442 (2d Cir. 2018). Under <u>Obeya</u>, Milman's 2000 Petit Larceny conviction no longer qualified as a crime of moral turpitude.[17]

In opposing Milman's motion to reopen, DHS conceded that her removal could no longer be premised on the Petit Larceny conviction alone as it did not qualify as a crime of moral turpitude. (IR17.) DHS, however, explained that Milman was still removable based on her 2000 conviction for device access fraud. (IR17.) DHS also stressed that even if that 2000 federal conviction were to be vacated, she would still be inadmissible (and thus removable) because each of her remaining 2010 convictions qualified as crimes of moral turpitude and provided an independent basis for her removal under § 212(a)(2)(A)(i)(I) of the INA, 8 U.S.C. § 1182(a)(2)(A)(i). (IR17.) DHS pointed out that Milman would also be inadmissible (and thus removable) under § 212(a)(2)(B) of the INA, 8 U.S.C. § 1182(a)(2)(B), because, given her Petit Larceny conviction and 2010 state court convictions, she had been convicted of "2 or more offenses . . . for which the aggregate sentences to confinement were 5 years or more is inadmissible" and that section applies even if the offense does not qualify as a crime of moral turpitude. (IR17.)

In a decision dated June 28, 2019, the BIA denied Milman's motion to reopen, reasoning that Milman was still removable based on her 2000 federal conviction and none of the vacated convictions were a basis for her removal. The BIA also stressed that the state court convictions were vacated based on the "statute of limitations, not innocence or due process issues" and that

---

[17] The Second Circuit's <u>Obeya</u> decision was the culmination of protracted litigation before both the Circuit and the BIA over this issue. <u>Obeya</u>, 884 F.3d 442. <u>Obeya</u> did not hold that Petit Larceny under New York law can never qualify as a crime of moral turpitude. Rather, the Second Circuit held that the BIA's reliance on a new rule, which was first announced in 2016, to make that determination could not be applied retroactively.

Milman was "still unworthy of a positive exercise of discretion."[18]  (IR4.)  Milman subsequently

sought review of the BIA's denial of the motion to reopen before the Second Circuit, which denied

her petition for review.  (Milman v. Barr, 19-2011, DE No. 34.)

## II.  DISCUSSION

Milman's § 2255 motion must be dismissed because she was longer in federal custody for

her device access fraud conviction when she filed her § 2255 motion.  See United States v. Brito,

No. 20-CR-63, 2022 WL 3025833, at *2 (S.D.N.Y. Aug. 1, 2022).  Accordingly, the Court turns

to Milman's coram nobis petition, which also incorporates all the arguments raised in her § 2255

motion.  As explained below, the Court denies that petition.

## A.  Standard for Coram Nobis Petitions.

"'A writ of error coram nobis is an extraordinary remedy' typically granted only when a

prisoner is out of custody and so cannot pursue habeas relief."  Doe v. United States, 915 F.3d 905,

909 (2d Cir. 2019) (quoting Kovacs v. United States, 744 F.3d 44, 49 (2d Cir. 2014)).  "Coram

nobis is 'not a substitute for appeal, and relief under the writ is strictly limited to those cases in

which errors of the most fundamental character have rendered the proceeding itself irregular and

invalid.'"  United States v. Mandanici, 205 F.3d 519, 524 (2d Cir. 2000) (quoting Foont v. United

States, 93 F.3d 76, 78 (2d Cir. 1996)).

"The proceedings leading to the petitioner's conviction are presumed to be correct, and

"the burden rests on the accused to show otherwise."  Foont, 93 F.3d at 78–79 (quoting United

---

[18]  As noted earlier, given Milman's circumstances, her immigration hearing turned on whether her convictions rendered her "inadmissible."  However, it appears that, if she had succeeded in obtaining a discretionary waiver under Section 212(h) for her 2000 device access fraud conviction, then DHS could not have sought to subsequently deport under 8 U.S.C. 1227 based solely on that conviction.  See Matter of Balderas, 20 I. & N. Dec. 389, 391 (BIA 1991) (explaining that "once a waiver was granted as to excludability [under the since-repealed Section 212(c)], it was granted as to deportability (and vice versa)"); Matter of Voss, 28 I. & N. Dec. 107, 109–12 (BIA 2020) (applying same principle where alien obtained cancellation of removal in first proceeding); In Re: Aponiram Aguilar-Orellana, No.: AXXX XX4 261 - LAN, 2008 WL 5025179, at *1–2 (DCBABR Oct. 28, 2008) (same).

States v. Morgan, 346 U.S. 502, 507 (1954)).  Thus, "the bar for succeeding on such a writ is a high one, first because great respect is placed upon the finality of judgments, . . . and second, because 'a court must presume that the proceedings were correct, and the burden of showing rests on the petitioner.'"  United States v. Hernandez, 283 F. Supp. 3d 144, 149 (S.D.N.Y. 2018) (quoting Fleming v. United States, 146 F.3d 88, 90 (2d Cir. 1998)).

To receive coram nobis relief, a petitioner must show "that 1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate relief earlier, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ."  Kovacs, 744 F.3d at 49 (quoting Foont, 93 F.3d at 79).

"Ineffective assistance of counsel, including during the plea-bargaining process, is a circumstance compelling the grant of a timely application for coram nobis relief."  Doe, 915 F.3d at 910.

With respect to the second prong, although "[n]o statute of limitations governs the filing of a coram nobis petition[,] . . . . the petitioner must demonstrate 'sound reasons' for any delay in seeking relief."  Kovacs, 744 F.3d at 54 (quoting Foont, 93 F.3d at 79).  "'The critical inquiry . . . is whether the petitioner is able to show justifiable reasons for the delay.'"  Id. (quoting Foont, 93 F.3d at 80).  Determining whether sound reasons exist for a petitioner's delay, "requires inquiry into 'the circumstances surrounding the petitioner's failure to raise the issue earlier,' [Foont, 93 F.3d at 80], and is similar to the inquiry about whether a federal prisoner who moves to vacate his sentence, 28 U.S.C. § 2255, could have discovered earlier, through the exercise of due diligence, the facts supporting his motion."  Gonzalez v. United States, 981 F.3d 845, 850–51 (11th Cir. 2020).

When seeking post-conviction relief, a defendant is not entitled to a hearing when her "allegations are 'vague, conclusory, or palpably incredible.'" <u>Gonzalez v. United States</u>, 722 F.3d 118, 130–31 (2d Cir. 2013) (citation omitted) (addressing § 2255 motion).  "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." <u>Id.</u> at 130–31.

## B.  **Milman's Conflict of Interest Claims.**

Milman claims that she received ineffective assistance of counsel because her counsel, Vogelman, labored under a conflict of interest because he also represented Rodzinski.  Rodzinski allegedly paid for Vogelman's fees and was also a target of the investigation.  Milman contends that the AUSA on the case agreed to not to indict Rodzinski if Milman pled guilty.  According to Milman, because of this conflict, Vogelman wanted to ensure that she pled guilty and provided ineffective assistance that led to her pleading guilty.  Milman claims that Vogelman: (1) incorrectly advised her that pleading guilty to device access fraud would "probably not" result in her being deported; (2) failed to seek discovery before her guilty plea to ensure that the monetary threshold to commit device access fraud was met; and (3) failed to argue, at sentencing, that Petitioner only played a minor role in the crime.

### 1. Standard for Addressing Conflict of Interest Claims

As the Second Circuit has explained:

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." United States v. Schwarz, 283 F.3d 76, 90 (2d Cir.2002) (internal quotation marks and citation omitted). Although a defendant is generally required to show prejudice to prevail on an ineffective assistance of counsel claim, "this is not so when counsel is burdened by an actual conflict of interest." Id. at 91. Where a defendant shows "(1) an actual conflict of interest that (2) adversely affected his counsel's performance," prejudice is presumed. Id.; Armienti v. United States, 234 F.3d 820, 824 (2d Cir.2000); see also Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). There is an actual conflict between lawyer and client "when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" Winkler v. Keane, 7 F.3d 304, 307 (2d Cir.1993) (quoting Cuyler v. Sullivan, 446 U.S. 335, 356 n. 3, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (Marshall, J., concurring in part and dissenting in part)).

To show that such a conflict adversely affected his counsel's performance, [a defendant] must establish an "actual lapse in representation" that resulted from the conflict. Cuyler, 446 U.S. at 349, 100 S.Ct. 1708. This is a two-part showing. First, [the defendant] must demonstrate the existence of some "plausible alternative defense strategy not taken up by counsel." United States v. Moree, 220 F.3d 65, 69 (2d Cir. 2000) (internal quotation marks and citations omitted). In this regard [the defendant] does not need to show that the alternative defense "would necessarily have been successful." Id. (internal quotation marks and citations omitted). It would be sufficient to show that the alternative strategy "possessed sufficient substance to be [ ] viable ...." Id. (internal quotation marks and citations omitted). Second, [the defendant] must show "causation"-i.e., that the alternative defense was "inherently in conflict with or not undertaken emphasized the attorney's other loyalties or interests." Id. (internal quotations marks and citations omitted). In other words, he must show that "trial counsel chose not to undertake [the alternative strategy] because of his conflict." Winkler, 7 F.3d at 309.

LoCascio v. United States, 395 F.3d 51, 56–57 (2d Cir. 2005).

### 2. Milman's Affidavits Do Not Establish a Conflict or Sound Reasons for Her Delay

The crux of Milman's conflict of interest argument (as well as her purported excuse for not bringing her conflict claim earlier) relies on the following alleged factual predicate: (1) Rodzinski informed Alexander Milman in September 2015 of an alleged arrangement between Vogelman

and the AUSA prosecutor in which the AUSA agreed to not indict Rodzinski if Milman pled guilty; and (2) Alexander Milman then relayed this information to Milman two days before his death.

But as set out below, the record does not include sufficient evidence to: (1) establish the existence of this alleged arrangement; (2) justify Milman's delay in bringing her conflict claim; or (3) warrant a hearing on any of these issues.[19]

Petitioner's 2016 affidavit attests in relevant part:

¶ 8. The store owner, Gary Radzinsky, was investigated along with me. He retained counsel for himself, and I was informed that Radzinsky's lawyer, Mr. Vogelman, would also serve as my lawyer. Mr. Vogelman advised me to plead guilty, and he said I would probably not go to jail. By reason of my guilty plea, the owner, Mr. Radzinsky, was not charged. I believe that my lawyer gave me up in order to secure a beneficial result for his primary client, even though I, as a non-citizen of the U.S., faced removal from the United States as result of my guilty plea.

¶ 9. Since the issue of removal was discussed, my attorney should have investigated the charge thoroughly . . . . But [Mr. Vogelman] did not want a trial as that would have resulted in the prosecution of Mr. Radzinsky, as well as me.

****

¶ 11. My attorney also should have warned me about the issue of conflict of interest in representing multiple clients, which warning would have alerted me to evaluate his loyalty. This failure to warn was exacerbated by the fact that his primary client, Radzinsky, was paying the fee. I was treated as a less important client. By giving me up and advising me to plead guilty, Mr. Vogelman achieved a big win for Radzinsky.

¶ 12. I believe that my attorney, Mr. Vogelman, failed to demand evidence of the credit card charges because he was concerned that by doing so it would be interpreted as "making waves" and that the AUSA would dishonor an earlier commitment to forgo indicting Mr. Radzinsky in exchange for my guilty plea.

****

¶ 12.[sic] If I had known that Mr. Vogelman gave me up in order to save Mr. Radzinsky, I would not have pleaded guilty. . . .

****

---

[19] In addressing Milman's conflict-of-interest claim, the Court has only considered the exhibits submitted by the parties and has not considered any additional documents from 2005 tax case or immigration proceeding.

¶ 14.  I first learned of the potential removal proceeding in immigration court from the notice to appear [from DHS] that was mailed to me April 28, 2015. . . . The day I received that notice somewhat thereafter is the date on which the facts supporting my claim that my attorney's failure to pursue discovery of the amount of the loss and his consequent ineffective assistance, could have been discovered through the exercise of due diligence. . . .

(2016 Milman Aff.)

In her 2018 Affidavit, Milman claims that "I learned about Mr. Vogelman's <u>conflict</u> from my husband on September 10, 2015, in Immigration Court in Bedford, New York.  Rodzinsky had admitted it to him a few days earlier."  (Dec. 6, 2018 Aff. of Olga Milman ("2018 Milman Aff.") ¶ 10 (emphasis added), ECF No. 26.)

Milman's affidavits are insufficient to establish that this purported agreement between Vogelman and the AUSA existed or even to warrant a hearing on this factual question.  Two of the critical assertions in Milman's 2016 affidavit about this purported arrangement are based simply on her "belief."  (2016 Milman Aff. ¶ ("I <u>believe</u> that my lawyer gave me up in order to secure a beneficial result for his primary client."); <u>id.</u> ¶ 12 ("I <u>believe</u> that my attorney, Mr. Vogelman, failed to demand evidence of the credit card charges because he was concerned that by doing so it would be interpreted as 'making waves' and that the AUSA would dishonor an earlier commitment to forgo indicting Mr. Radzinsky in exchange for my guilty plea that Radzinsky.").  The other assertion in her 2016 Affidavit about this alleged arrangement—"[b]y reason of my guilty plea, the owner, Mr. Radzinsky, was not charged"—is utterly conclusory.  Milman's 2016 affidavit provides no factual basis for this conclusory statement, which does not even mention Vogelman or the AUSA.

Petitioner's 2018 affidavit is also vague and conclusory.  Critically, she does not identify what her husband told her about Vogelman's "conflict" or set out any particulars of what her

husband allegedly told her about his conversation with Rodzinski. Petitioner's affidavit also does not state that she "first learned" of this "conflict" during this conversation—a further reason why this affidavit fails to establish sound reasons for her delay.[20] Petitioner's affidavit also contains multiple levels of hearsay.

For the reasons stated above, Milman's affidavits are too vague and conclusory on their face to warrant any relief, including a hearing. The statements are also not credible. The timing of this alleged conversation with her husband—two days before his passing—is extremely suspicious. As is the fact that Milman did not mention this conversation in her 2016 Affidavit.[21] Milman has also not provided any corroborating affidavit from Rodzinski (or even indicated that she tried to obtain such an affidavit).

The underlying claim about purported improper conduct by the AUSA also is not credible. The notion that the AUSA on the case, who was allegedly aware that Rodzinski and Milman were represented by the same attorney, agreed not to pursue charges against Rodzinski in exchange for Milman's plea is difficult to believe.

The purported deal between Vogelman and the AUSA also makes little sense given Milman's cooperation with the Government and the proffers she made after she pled guilty to the device access fraud charge. Milman has never claimed that Vogelman or Rodzinski instructed her to not mention Rodzinski's purported involvement in the scheme during these proffers. Nor has

---

[20] Even if the Court were to assume arguendo that Milman's 2016 Affidavit were sufficient to establish the existence of the alleged arrangement between Vogelman and the AUSA, Milman still has not established sound reasons for her delay in seeking relief. Neither of her affidavits state when she learned of this alleged agreement. As noted above, her 2018 affidavit simply states that in 2015 she learned about an unspecified "conflict" from her husband. Such vague and conclusory statements are insufficient to justify her lengthy delay in seeking vacatur.

[21] The Court notes that the reply brief for Milman's § 2255 motion asserts that Alexander Milman informed her in the fall of 2015 that Vogelman admitted, in a conversation with Alexander Milman, the purported deal with the AUSA. (§ 2255 Reply Br. at 2–3.) This factual assertion, however, is not supported by a citation to any record evidence. Moreover, this claim is not even consistent with Milman's 2018 Affidavit, which claims that her husband spoke to Rodzinski, not Vogelman.

Milman claimed that she told them that she would not implicate Rodzinski during her proffers. The notion that, under those circumstances, Vogelman and Rodzinski would rely on a purportedly informal grant of immunity by the AUSA is not credible. If Rodzinski had any involvement in the scheme, Milman's cooperation with the government would seem to present a substantial risk to him.

For all the reasons set forth above, Milman's claim about the alleged agreement between Vogelman and the AUSA—which is the crux of her conflict of interest argument—fails.

To the extent Milman is pursuing a conflict of interest claim based on other grounds, such as Rodzinski's alleged payment of Vogelman's fees, any such claim would fail because, inter alia, Milman cannot stablish sound reasons for seeking relief earlier.[22] Milman was no doubt aware, in 1999 and 2000, of the essential facts underlying any such claims. Milman admits that "[Rodzinski] retained counsel for himself, and I was informed that Rodzinsky's lawyer, Mr. Vogelman would also serve as my lawyer." (2016 Milman Aff. ¶ 8.) Thus, Milman knew, even before her guilty plea, that Vogelman was also acting as Rodzinski's lawyer. Additionally, if, as Milman claims,

---

[22]   Milman also claims that her delay in bringing her conflict claims should be excused because she filed FOIA requests to obtain relevant evidence and the Government allegedly dragged its feet and stonewalled her FOIA requests. This argument is utterly meritless. Milman's delay in seeking vacatur of her plea cannot be attributed to the Government.

In October 2012, Milman submitted a FOIA request to "FOIL OFFICER, United States Attorney's Office, Eastern District of New York," which sought all files related to "U.S. v. Olga Milman." (Scharf Decl, Ex. A, ECF No. 27-1.) After not receiving a response, Milman filed an administrative appeal with the Department of Justice in Washington. (Id.) In June 2013, the DOJ informed Milman that neither the Criminal Division in Washington nor the U.S. Attorney's Office for the Eastern District had a record of receiving Milman's FOIA request. Notably, Milman's affidavit of service for her October 2012 FOIA request includes an incomplete address that is missing a street number, street name, city, state, and zip code. (Id.) Given that Milman's October 2012 FOIA request was not properly addressed and the U.S. Attorney's Office had no record of receiving it, this request cannot possibly justify Milman's delay.

In June 2013, Milman submitted another FOIA request. In this request, she specifically requested records concerning "05-CR-65801," which is Milman's 2005 tax case. Milman asserts that, after various delays, she received none of the items she had requested. The record, however, shows that Milman's second FOIA request did not even concern the instant case and instead asked for documents concerning her 2005 federal tax case. Accordingly, the Government's alleged failure to respond to this request does not help her claims here.

Rodzinski was paying Vogelman's fees for her, then she obviously would have known of that fact at the time of Vogelman's representation. Notably, neither of her affidavits claim that she believed, at the time of her plea and sentencing, that anyone else other than Rodzinski was paying Vogelman's fees.

Finally, Milman's conflict claims also fail because she has not shown that Vogelman failed to pursue a "plausible alternative defense strategy." Milman claims that, before she pled guilty, Vogelman should have sought discovery to show that the statutory threshold for device access fraud was met. This alleged potential defense was fruitless. The Government only had to prove $1,000 to meet the statutory threshold and the record shows that the Government would have had no difficulty meeting that burden. Over $100,000 in fraudulent charges were reported by credit card companies and the average price of a dress at Milman's high-end store cost $2,000. Milman also maintains that Vogelman failed to argue, at sentencing, for a reduction based on Milman's purportedly minor role. This argument is not supported by any evidence in the record. Such an argument also ran a risk that Judge Mishler might believe that Milman was not accepting full responsibility for her actions and was trying to minimize her role. Instead, Vogelman pursued stronger arguments based on Milman's family circumstances that ultimately caused her to receive an extremely lenient sentence of six months home confinement and probation. Milman's claim that Vogelman gave her erroneous advice about immigration consequences, which she also appears to bring as a stand-alone claim, is elaborated on below.

For the reasons set out above, the Court denies the conflict-of-interest claim in Milman's coram nobis petition. Milman has not set forth sound reasons for her delay and her claim also fails on the merits.

**C. Alleged Ineffective Assistance Concerning Immigration Consequences.**

Milman asserts that Vogelman provided her deficient advice about the immigration consequences of her guilty plea when he told her that she would "probably not" be deported. She relies on this allegedly erroneous advice as part of her conflict-of-interest claim. Namely, she contends that Vogelman provided this erroneous advice because he wanted to induce her to plead guilty to save Rodzinski from prosecution based on Vogelman's alleged arrangement with the AUSA. This aspect of Milman's claim fails because, for the reasons stated above, she is not entitled to coram nobis relief on her underlying conflict-of-interest claim as the factual record here does not: (1) support the merits of this claim; or (2) justify her lengthy delay in seeking vacatur.

Milman also appears to advance a stand-alone ineffective assistance of counsel claim based on Vogelman's allegedly erroneous advice. This claim also fails. Milman has not provided sound reasons to justify her delay in bringing this ineffective assistance claim. This claim also fails on the merits under both prongs of ineffective assistance of counsel standard in <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984).

**1. Milman Has Not Established Sound Reasons for Her Delay.**

Milman's papers do not articulate sound reasons why she waited until 2016 to seek vacatur based on Vogelman's allegedly incorrect advice about immigration consequences.

In her coram nobis petition, Milman contends that "sound reasons exist for [her] failure to seek relief sooner than March, 2016." (Coram Nobis Pet. at 5.) In support of this argument, Milman points to the alleged conversation she had with her husband about Vogelman's purported "conflict." (<u>Id.</u>) Milman's brief then simply recounts, without any further explanation or argument, that Milman "learned of the removal proceedings against her when the [DHS] served the 2015 Notice of Appear on her in May 2015. (<u>Id.</u>)

29

Milman's reply brief for her coram nobis petition does not even address whether she has sound reasons for delay in bringing a stand-alone ineffective assistance claim. Rather, she simply asserts that her delay in filing her coram nobis petition was justified because she did not learn about Vogelman's alleged "conflict" until 2015 and because her FOIA requests were stifled by the Government. The Court, however, has already rejected those arguments and, in any event, neither is relevant to her stand-alone ineffective assistance claim.

The Court also notes that Milman attests, in her 2016 Affidavit that:

> I first learned of the potential removal proceeding in immigration court from the notice to appear [from DHS] that was mailed to me April 28, 2015. . . . The day I received that notice somewhat thereafter is the date on which the facts supporting my claim that my attorney's failure to pursue discovery of the amount of the loss and his consequent ineffective assistance, could have been discovered through the exercise of due diligence.

(2016 Milman Aff. ¶ 14.)

None of these points are sufficient to establish that Milman had sound reasons for waiting until 2016 to seek vacatur of her conviction based on Vogelman's allegedly erroneous advice about the immigration consequences of her plea. As explained below, if the Court looks solely at the exhibits provided by the parties in the instant proceeding, Milman has not established sound reasons for her delay. Moreover, the additional documents from Milman's immigration proceedings and her 2005 federal tax case discussed previously only further support the Court's conclusion that Milman has not established sound reasons for her delay.

### i. Milman Cannot Establish Sound Reasons for Her Delay Based on the Exhibits Provided by the Parties

Milman contends that Vogelman's advice that she would "probably not" be deported was erroneous because, according to her brief, her conviction would "certainly" result in her deportation. (Coram Nobis Pet. at 7.) Milman's argument appears to be premised on her claims

that:  (1) her 2000 device access fraud conviction is a crime involving moral turpitude, which rendered her presumptively inadmissible and deportable; and (2) she was "certain[]" to actually be removed based on that conviction.[23]

Thus, the critical questions here are when did Milman learn that Vogelman's advice was incorrect and when did she, at the very least, have reason to believe that his advice was incorrect. Milman's briefs and affidavits, however, simply do not address either of these points.  If Milman only learned that Vogelman's advice was incorrect after she received the 2015 Notice to Appear (or upon receipt of the notice), then she may have sound reasons that would justify her delay in waiting until 2016 to seek vacatur,  But if Milman learned prior to 2015 that Vogelman's advice was erroneous (or had reasons to believe that his advice was erroneous) then it would be much more difficult for her to provide sound reasons for waiting until 2016 to seek vacatur.

Milman, however, does not even identify when she learned that Vogelman's advice was incorrect.  Nor does she say anything about the time period between 2000 and 2015.  Accordingly, the bare fact that she received a Notice to Appear in 2015 cannot establish sound reasons for her delay.

While Milman's 2016 affidavit states that she "first learned of the potential removal proceedings in immigration court from" the Notice to Appear she received in 2015, (2016 Milman Aff. ¶ 14), this vague statement does not establish sounds reasons for her delay.

On its face, this statement appears to indicate that Milman first learned, from the notice, that DHS had brought a proceeding "in immigration court."  That is not surprising as this Notice

---

[23]  Milman does not squarely explain why Vogelman should have known, in 1999, that her device access fraud conviction rendered her removable.  (See discussion infra pp. 38–41; Coram Nobis Pet. at 7.)  An alien is deportable if, inter alia, the alien is "convicted of a crime involving moral turpitude committed within five years . . . after the date of admission."  8 U.S.C. § 1227(a)(2)(A)(i).  And, an alien is inadmissible if, inter alia, the alien has been convicted of, or admits to, "a crime involving moral turpitude."  8 U.S.C. § 1182(a)(2)(A).

31

to Appear initiated the proceedings "in immigration court." Moreover, this statement does not indicate that Milman learned, upon receipt of this notice, that Vogelman's advice was incorrect. Additionally, Milman's claim that she "first learned of <u>potential</u> removal proceedings in immigration court" from the 2015 Notice to Appear does not provide sounds reasons to justify her delay. While Milman claims that Vogelman erred in advising her that she would "probably not" be deported, she was, based on his advice and the statements made at her guilty plea, already aware that deportation was a risk and possibility. (2016 Milman Aff. ¶ 4 ("[Vogelman] was aware of <u>potential</u> removal proceedings . . . and <u>so informed me</u> before I entered my plea of guilty." (emphasis added); 1999 Plea Tr. 18.) Thus, she was already aware, at the time of her plea, of "potential" removal proceedings.

Milman's 2016 Affidavit also states: "The day I received [the 2015 Notice to Appear] somewhat thereafter is the date on which the facts supporting my claim that my attorney's failure to pursue discovery of the amount of the loss and his consequent ineffective assistance, could have been discovered through the exercise of due diligence." (2016 Milman Aff. ¶ 14.) This vague and conclusory statement does not establish sound reasons for her delay.

The vague and conclusory statements from Milman's affidavit cited above are also insufficient to establish sound reasons for Milman's delay given that: (1) Milman says nothing about the time period between 2000 and 2015; and (2) Milman's own exhibits indicate that she had reason to believe that she was at a heightened risk of removal in 2005 and that she was, in fact, concerned about this risk of removal years before she received the 2015 Notice to Appear.

The 2015 Notice to Appear—which Milman attached to her § 2255 motion—explicitly references the fact that, at JFK Airport in November 2005 she was "paroled" into the United States for the purpose of "deferred inspection." Milman's affidavits makes no effort to explain why she

waited more than a decade after this incident to seek vacatur of her plea.  In fact, Milman's papers say essentially nothing about the time period between 2000 and 2015.  The only other reference to the time period between 2000 and April 2015 contained in Milman's affidavits or supporting documents concern her attempts beginning in 2012 to obtain documents through FOIA requests. Yet her 2012 FOIA request only undermines any claim that her failure to act between 2000 and 2016 was justified.  In her 2016 Affidavit, Milman states that she made this FOIA request "to obtain documents that would show the credit card transactions to establish a lesser offense, as opposed to a major moral turpitude felony for which one may be removed from the United States." (2016 Milman Aff. ¶ 9.)  Thus, Milman herself admits that years before receiving her 2015 Notice to Appear she was concerned about the immigration consequences of her 2000 device access fraud conviction.

        For the reasons set out above, even if the Court were to rely solely on evidence submitted by the parties in this § 2255/coram nobis proceedings, Milman has not shown sounds reasons that justify her delay in waiting until 2016 to seek vacatur of her conviction.

        *ii.  The Relevant Records from Milman's Tax Case and Immigration Proceeding Further Show that Milman Has Not Established Sound Reasons for Her Delay.*

        The background section of this opinion recounts the relevant documents from these two proceedings that can be appropriately considered here as well as reasonable inferences that the Court has drawn from both those documents and the exhibits submitted by the parties in the instant § 2255/coram nobis proceeding.

        After Milman encountered Customs at JFK and was paroled into the United States in November 2005, she was required to appear at a Deferred Inspection Hearing in January 2006. This "parole" and "deferred inspection" was a result of Milman's two convictions from 2000, both of which were then cited as the basis for her removal in the 2015 Notice to Appear.  At the time

of her November 2005 encounter with Customs, Milman was already represented by Scharf on her tax case and he became involved in the Deferred Inspection Hearing.

Given those facts, Milman surely learned around this time that her parole and Deferred Inspection Hearing were due to her 2000 device access fraud conviction and 2000 Petit Larceny conviction. It is also reasonable to infer—particularly in the absence of any evidence to the contrary—that Petitioner had further interactions with DHS after her January 2006 hearing date. During this time, she was cooperating with the Government.

Additionally, between 2004 and 2010, Petitioner was investigated and prosecuted in the 2005 federal tax case as well as the state fraud case that resulted in her 2010 convictions. These criminal cases gave Petitioner ample reason, while she was represented by Scharf, to inquire into the potential immigration consequences of both her prior convictions and the new charges that she was facing. And, as noted above, Milman's 2016 Affidavit and 2012 FOIA request confirm that she was concerned, years before receiving the 2015 Notice to Appear, that she would be deported based on her 2000 device access fraud conviction.

Milman's testimony from her immigration hearing also shows that Milman knew that, after her "Deferred Inspection," she faced an increased risk of removal proceedings based on her 2000 convictions. At the hearing, Milman was questioned whether, during her cooperation between 2005 and 2009, she ever "ask[ed] any of these people that you had assisted if they could write a letter or appear in your immigration case to assist you," (IR403.) In response, Milman testified that she told the agent she worked with that she "might have" an immigration case and the agent told Milman that he would write to "immigration and explain to them that I cooperated."[24] (IR403.)

---

[24] Milman admitted that she never ended up requesting such a letter from the agent. (IR403.)

The events discussed above gave Milman, at the very least, ample reason and opportunity to inquire into the soundness of Vogelman's advice.  And, critically, Milman's affidavits say <u>nothing</u> about any of the events above and provide no sound reasons for why she did not seek vacatur of her 2000 conviction prior to receiving the 2015 Notice to Appear.  As explained in the previous section, Milman's affidavits are, on their face, insufficient to establish sound reasons for her delay and say nothing about the time period between 2000 and 2015, during which—as Milman's own exhibits indicate—she had an encounter with DHS in 2005 and was admittedly concerned about the risk of removal,  The additional documents cited above reinforce the Court's determination that Milman has failed to present sound reasons to justify her delay.  Cf. <u>Kroytor  v. United States</u>, No. 03-CR-00379, 2019 WL 1488740, at *5 (E.D. Cal. Apr. 4, 2019) (finding that petitioner had reason to challenge the accuracy of defense counsel's immigration advice when he was questioned by immigration inspectors about his fraud conviction and ordered to appear for a "Deferred Inspection"), <u>report and recommendation adopted</u>, 2019 WL 2546930 (E.D. Cal. June 20, 2019), <u>aff'd</u>, 977 F.3d 957 (9th Cir. 2020).

Milman ultimately waited until 2016, more than fifteen years after her conviction became final to seek vacatur.  As Milman has not presented sound reasons to justify this lengthy delay, the stand-alone ineffective assistance claim about immigration advice that she is pursuing in her coram nobis petition is denied.  See <u>Korac v. United States</u>, No. 93-CR-848, 2011 WL 2365811, at *4 (S.D.N.Y. June 6, 2011) ("[W]here a petitioner has learned that a conviction carries possible immigration consequences and nevertheless waits to seek coram nobis relief for a period of several years . . . no sound reason exists.").

The facts set forth above contrast with the Second Circuit's decision in <u>Kovacs v. United States</u>, 744 F.3d 44 (2d Cir. 2014), where the panel found that the petitioner had sound reasons for

35

not seeking to vacate his plea earlier based on allegedly ineffective assistance concerning immigration consequences. When Kovacs pled guilty to misprison of a felony in 1999, his attorney stated, on the record, that this offense "is not deportable." Id. at 48. After his conviction, Kovacs engaged in regular international travel until April 2009 "when immigration officials questioned [his] eligibility for reentry on the ground that misprision of a felony is considered a crime of moral turpitude" and directed him to appear for an interview about his immigration status. Id. at 49. "Kovacs discussed his options with his lawyers, but allegedly none of them advised him to seek vacatur of his conviction." Id. at 49. Kovacs insisted that he first learned about the possibility of coram nobis in October 2011. After negotiations with the Government about vacating his plea failed, he filed his coram nobis in May 2012. The Second Circuit found that Kovacs demonstrated sound reasons for the delay, reasoning that: (1) it was improbable that Kovacs and his attorneys would have promptly thought about coram nobis, given its "arcane" nature; and (2) no tactical reasons for the delay were suggested by the record. Id. at 54.

Milman's case is clearly distinguishable from Kovacs. Kovacs acted relatively expeditiously in seeking legal advice and filed his coram nobis only two-and-half-years after he was alerted, by his encounter with immigration officials, that his attorney's advice was incorrect. Kovacs does not hold that the "arcane" nature of coram nobis excuses delays indefinitely. See United States v. Rodriguez-Hilario, 699 F. App'x 30, 31 (2d Cir. 2017) (affirming denial of coram nobis petition where defendant failed to provide sounds reasons to explain his twelve-year delay in bringing his petition).

Here, Milman waited almost ten years after her encounter with DHS in November 2005 to seek vacatur of her plea. Moreover, Milman has never identified when she learned that Vogelman's advice was incorrect or when she learned about that she could try to vacate her

conviction.  The record here also suggests various tactical reasons for Milman's delay.  She was cooperating with the government to avoid jail time for her 2005 tax offense.  Seeking to vacate her 2000 plea could have complicated her attempted cooperation.  Moreover, her cooperation may have been a factor in DHS's decision not to begin removal proceedings before 2015.  Furthermore, the longer that Milman delayed, the less likely it was that the Government would still pursue a conviction if her request for vacatur were successful.  A prosecution would have been much more likely in 2005 than 2015, eighteen years after the events in question.  Finally, Kovacs does not hold that all delays, whatever their length, are justified unless there are tactical reasons for the delay apparent from the record.  See Rodriguez-Hilario, 699 F. App'x 30, 31.

As Milman has not established sound reasons for her delay in seeking relief, the Court denies her ineffective assistance claim.

## 2.  Merits of Milman's Ineffective Assistance Claim.

"A claim of ineffective assistance entails a showing that: 1) the defense counsel's performance was objectively unreasonable; and 2) the deficient performance prejudiced the defense."  Kovacs, 744 F.3d at 49–50.

"The performance component of the Strickland test asks whether a 'counsel's representation fell below an objective standard of reasonableness.'"  Id. (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)).  "A defense counsel's performance is unreasonable when it is so deficient that it falls outside the "wide range of professionally competent assistance."  Id. (quoting Strickland, 466 U.S. at 690).

Milman asserts that, rather than advising her that she would "probably not" be deported, Vogelman should have instructed her that her conviction would "certainly" result in her

deportation.[25]  (Coram Nobis Pet. at 7.)  Milman, however, has not established that Vogelman's advice was unreasonable under Strickland.[26]

Milman does not squarely explain why Vogelman should have known, in 1999, that her device access fraud conviction rendered her removable.  (See Coram Nobis Pet. at 7.)  The Court assumes that Milman's 2000 device access fraud conviction is a crime involving moral turpitude that rendered her:  (1) presumptively inadmissible under 8 U.S.C. § 1182(a)(2)(A); and (2) presumptively deportable under 8 U.S.C. § 1227(a)(2)(A)(i) because it occurred "within five years . . . after the date of [her] admission."  See n. 23 supra.  Milman asserts, without any further analysis, that this conviction would "certainly" result in her deportation.  But as this record makes clear, it was not "certain" that Milman would be removed.  In order for Milman to be removed, two things had to occur:  (1) DHS had to initiate removal proceedings; and (2) during those removal proceedings, Milman would either have to be found ineligible for a potential discretionary waiver or the IJ and the BIA would have decide not to exercise discretion in her favor.

As explained below, Vogelman's prediction that Milman would "probably not" be deported did not fall outside the "wide range of professionally competent assistance."  See

---

[25]  Milman's 2018 affidavit states that before she accepted the plea, Vogelman told her she would "most likely not be deported."  (2018 Milman Aff. ¶ 4.)  This assertion is consistent with Vogelman's statements at the plea hearing that Milman would "probably not" be deported.  Moreover, Milman's brief never argues that there is a material difference between these two statements and her brief only mentions Vogelman's "probably not" statement from the plea hearing.

Milman's 2018 affidavit also states that Vogelman "assured me . . . I will not be deported."  (2018 Milman Aff. ¶ 5.)  As Milman's brief does not rely on this assertion and instead focuses solely on Vogelman's statement that she would "probably not" be deported, she has waived any arguments based on this aspect of her affidavit.  Moreover, this aspect of her affidavit is simply not credible.  This alleged statement is not contained in her 2016 Affidavit and is contrary to the specific statements that Vogelman made on the record at the plea hearing.

[26]  The Government asserts that Milman cannot pursue an ineffective assistance claim because Padilla v. Kentucky, 559 U.S. 356, 130 S.Ct. 1473 (2010), is not retroactive.  See Chaidez v. United States, 568 U.S. 342, 344 (2013).  Chaidez, however, does not preclude a defendant from pursuing an ineffective assistance claim based on affirmative misrepresentations of immigration consequences rather than on mere silence about immigration consequences.  See Kovacs v. United States, 744 F.3d 44, 51 (2d Cir. 2014); United States v. Couto, 311 F.3d 179 (2d Cir. 2002).  However, even assuming that Milman's claim is not precluded on retroactivity grounds because it involves an alleged affirmative representation, it fails on the merits for the reasons stated below.

Mohamed v. United States, No. 18-CV-11193, 2020 WL 1503073, at *3 (S.D.N.Y. Mar. 30, 2020)
(finding that defense counsel was not ineffective for advising defendant that he "may" be deported
based on federal plea in 2008 because defendant "had avenues of relief available to him [in his
removal proceedings] . . . . to forestall or prevent removal" and those removal proceedings—which
DHS only pursued nine years later after defendant's subsequent fraud conviction in 2017—"were
[not] were initiated immediately following his 2008 conviction").

First, it must be stressed that Vogelman's "prediction" was caveated.  He emphasized that
deportation was a "possibility" and made clear that there were "no guarantees," (2000 Plea Tr. 17).
See Velazquez v. United States, 651 F. App'x 620, 622–23 (9th Cir. 2016) (finding that defense
counsel's performance was not deficient where he told defendant that he "could not guarantee what
the INS would do" and "did not promise [him] that he would not be deported").  The possibility
of removal was also pointed out in Milman's plea agreement.

Second, it was not erroneous for Vogelman's prediction to account for the fact that—even
though her conviction made Milman presumptively inadmissible and deportable as a legal
matter—to remove Milman, DHS would first have to decide whether to initiate (and continue)
removal proceedings against her.  See Mohamed, 2020 WL 1503073, at *3; cf. Velazquez, 651 F.
App'x at 622 ("[T]he INS still possesses discretion to abandon deportation proceedings in cases
involving aggravated felonies.").  Here, DHS took no steps to remove Milman until November
2005 and she appears to have only ended up on DHS's radar because she took an international
flight.  And DHS did not actually begin removal proceedings until 2015, after Milman was
convicted of multiple state crimes.[27]  The Court also notes that Milman has offered no evidence

---

[27]  Even if the Court were to ignore all the documents from Milman's tax and immigration case, the Court would still
reach the same conclusion based solely on Milman's own exhibits, which reference her 2005 parole and "deferred
inspection" and indicate that removal proceedings were not commenced until 2015, fifteen years after her conviction.

concerning the federal government's deportation priorities in 1999 when Vogelman made his prediction. Cf. State v. Papamilitiadis, No. A-5314-08T3, 2011 WL 2373305, at *1 (N.J. Super. Ct. App. Div. May 10, 2011) (rejecting ineffective assistance claim concerning 1997 plea where defense counsel told defendant that although "a plea of guilty could result in deportation . . . 'in reality, no one is ever deported [for] third degree charges, for cases involving theft'" and noting that the "deficiency alleged by defendant does not pertain to trial counsel's misrepresentation of immigration law; rather, it concerns counsel's assessment of United States immigration enforcement policy in 1997, a world very different from the one created by the events of September 11, 2001").

Third, Milman asserts that Vogelman's advice was erroneous because it was purportedly "clear" that her device access fraud conviction would "certainly" result in her deportation. (Coram Nobis Pet. at 7.) In support of this argument, Milman cites 8 U.S.C. §1227(a)(2)(B)(i). That provision—which concerns the drug trafficking conviction at issue in Padilla and which renders aliens deportable for almost all drug offenses—does not apply to Milman's device access fraud

conviction.[28]

Fourth, and perhaps most importantly, the notion that Milman's conviction was "certain" to result in her removal is simply incorrect. The decisions of the IJ and the BIA make that clear. Even with her device access fraud conviction, Milman was still able to meet the threshold requirements for obtaining a discretionary waiver of both her 2000 convictions pursuant to § 212(h) of the INA. Milman was ultimately denied this discretionary waiver and ordered removed because, given her lengthy criminal record that post-dated her 1999 guilty plea, the IJ and BIA refused to exercise their discretion in her favor. But based on the facts known to Vogelman in 1999, Milman's case for an exercise of discretion would appear to have been strong. Cf. Diunov v. United States, No. 08-CV-3184, 2010 WL 2483985, at *10 (S.D.N.Y. June 16, 2010) (finding that defense counsel's advice that defendant had "a 'good argument' for and a 'very good chance'

---

[28] Ineffective assistance claims concerning immigration consequences often involve aggravated felonies, which have certain severe immigration consequences. DHS sought to remove Milman because she was allegedly inadmissible based on her commission of crimes of moral turpitude. As such, her removal was not predicated on whether her device access fraud conviction qualified as an aggravated felony. Although under current law this conviction would likely be found to qualify as an aggravated felony, this conviction was not, given the law in 1999, clearly and indisputably an aggravated felony at the time of her plea. In fact, there were strong reasons in 1999 to believe that her conviction would not qualify as an aggravated felony. Device access fraud only qualifies as an aggravated felony if the loss to the victim or victims exceeds $10,000. 8 U.S.C. § 1101(a)(43)(M)(i). It was not apparent, at the time of Milman's plea, that her conviction would constitute an aggravated felony. As the Ninth Circuit has explained in a similar case:

> we do not believe it would have been apparent to any competent lawyer at the time of [the defendant's plea in 1999 to conspiracy to defraud the United States] that his crime constituted an aggravated felony. The statute to which [the defendant] pled guilty contains no specific dollar amount as an element, and it took the Supreme Court's decision in Nijhawan v. Holder, 557 U.S. 29, 32, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009), to clarify that courts ought to examine the record of conviction rather than the statutory elements alone to determine whether the $10,000 requirement in 8 U.S.C. § 1101(a)(43)(M)(i) is satisfied.

Velazquez, 651 F. App'x at *622. Notably, the Second Circuit held, in a 2007 case involving device access fraud, that the BIA could not—even when a statute defining the relevant offense was considered "divisible"—rely on a restitution order or a PSR to determine that the $10,000 threshold for an aggravated felony had been met. Dulal-Whiteway v. U.S. Dep't of Homeland Sec., 501 F.3d 116, 118 (2d Cir. 2007). In Milman's case, the device access fraud statute only required $1,000 in losses. Additionally, Vogelman made clear at the plea hearing that the $119,000 restitution amount listed in the plea agreement was not binding and Judge Mishler confirmed that the restitution number had "not yet been fixed" and "reserve[d] that." (Plea Tr. 16.) Judge Mishler ultimately determined, at sentencing, that Milman owed only $107,000 in restitution. Accordingly, it is doubtful that, prior to the Supreme Court's 2009 decision in Nijhawan v. Holder, 557 U.S. 29 (2009), Milman's device access fraud conviction would have been found to constitute an aggravated felony.

of obtaining a hardship waiver" was not unreasonable under the circumstances).  Milman's device access fraud conviction was her first offense, her husband was a U.S. citizen, she had two small children who were U.S. citizens, and she was planning to cooperate with the government.  It would not have been unreasonable for an attorney to conclude that an IJ and the BIA would, based on those facts, "probably" exercise any available discretion in Milman's favor.  Milman has offered no evidence to the contrary.

Ultimately, Milman has not established that Vogelman's caveated prediction fell outside the "wide range of professionally competent assistance."  See Mohamed, No. 18-CV-11193, 2020 WL 1503073, at *3.

Even if the Court were to assume arguendo that Vogelman's advice was deficient, Milman would have to establish prejudice by showing a "reasonable probability that, but for counsel's error, [she] would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 57-59 (1985); see also Roe v. Flores-Ortega, 528 U.S. 470 (2000).  "Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.  Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."  Lee v. U.S., 137 S. Ct. 1958 (2017).

Milman asserts that if she had been given correct advice she would not have pled guilty and would have insisted on proceeding to trial because she had a strong potential defense.  In her 2018 Affidavit, Milman states:

- "I would have rejected taking the plea if I had known that it would lead to mandatory deportation . . . .:  (2018 Milman Aff. ¶ 6.)

- "I would never have pleaded guilty to mandatory deportation.  I would have gone to trial and I would have prevailed.  Avoidance of deportation was more important to me than avoidance of jail."  (Id. ¶ 10.)

42

Milman cannot show prejudice here. While Milman's conviction subjected her to presumptively mandatory deportation and exclusion, her removal was not, as she claims, a certainty. As explained earlier, Milman had a strong argument for the BIA and IJ to exercise any available discretion in her favor based on her circumstances when she pled guilty in 1999. She was ultimately found eligible for a discretionary waiver but did not receive that waiver due to her subsequent criminal conduct. Given the record here, there is not a reasonable probability that, in 1999, Milman would have proceeded to trial if she had been advised that while she was presumptively deportable and excludable, she would ultimately be eligible for a hardship waiver and would have a strong argument for obtaining that discretionary waiver based on her circumstances (as they existed at the time of her plea).[29]

While Milman asserts that the risk of deportation was more important to her than avoiding jail given that she had young children and a husband who were U.S. citizens, the opposite inference is more plausible based on the record here. Given that her children were one and three at the time of her plea, Milman had compelling reasons to avoid immediate incarceration when weighed

---

[29] As explained earlier, Milman's papers assert that her device access fraud conviction rendered her removal a certainty. However, Milman's claim of "certainty" ignores the possibility that DHS would not initiate removal proceeding in the first instance. Additionally, Milman's papers do not address the possibility and probability—given both the facts of her case as they existed in 1999 and the state of the relevant law in 1999, including caselaw from the BIA and the federal courts—that she would be eligible for any discretionary relief and would ultimately receive such relief. In any event, the Court finds that given the record here—where Milman's removal proceeding has concluded—the prejudice inquiry should take into account what transpired in her removal proceeding and should not simply ask what prospective advice an attorney in 1999 should have given about the probability of Milman qualifying for, and ultimately obtaining discretionary relief from removal. This approach seems particularly appropriate here given that Milman has not addressed the issues noted above and instead has simply insisted that her deportation was a certainty.

Even assuming arguendo that Vogelman erred by overestimating the likelihood that Milman would be eligible, as a threshold matter, to qualify for the possibility of discretionary relief, it is difficult to see how Milman was prejudiced by any such error. Whatever the actual probability of Milman meeting the threshold requirements for such discretionary relief may have been in 1999, Milman ultimately did, in fact, qualify for discretionary relief from removal. Thus, any error by Vogelman on that point does not appear to be prejudicial (and was essentially harmless). Cf. Williams v. Taylor, 529 U.S. 362, 391–92 (2000) ("It is true that while the Strickland test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis. . . [and there are] situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate 'prejudice.'").

against the uncertain prospect of future removal proceedings where she could have a strong argument that the IJ and BIA should exercise all available discretion in her favor. Here, the nature of Vogelman's allegedly erroneous advice makes it difficult for Milman to establish prejudice. This is not a case where the defendant was told that she <u>would not be deported</u> for her conviction. Nor is this a case where the defendant was told nothing about potential immigration consequences. Vogelman made clear removal was possible and simply made a prediction that Milman would "probably not" be deported. Milman knew she faced a risk of removal and still decided, in the face of that risk, to plead guilty. Milman has not shown there is a reasonably probability that—if she had been told that she was presumptively deportable and that, while her ultimate removal was uncertain, she faced some higher risk of removal—she would have rejected the plea and proceeded to trial.

Milman also claims that she would not have pled guilty because she had a strong defense to the device access fraud charge. Milman maintains that she "apparently had a strong potential defense since the government was unable to respond to the court's questions how the statutory minimum for a Section 1029(a) could be proved . . . and that Rodzinsky was the one who accepted the credit card charges from customers who were his friends." (Coram Nobis Pet. at 8.) This argument is not persuasive. The plea hearing transcript does not suggest that the government would have had any difficulty meeting the $1,000 loss requirement for a device access fraud conviction. The PSR identifies more than $100,000 in fraudulent charges and the average dress at Milman's store sold for $2,000. As for Milman's claim that Rodzinski was the one who accepted the credit cards and that the customers at issue were his friends, there is no evidence in the record to support this claim or to suggest that this would have been a potentially viable defense at trial.

The Court also notes that, after her 1999 guilty plea for device access fraud, Milman subsequently pled guilty in 2005 to another federal crime that had at least potential adverse immigration consequences.  That plea undermines Milman's claim that she would have gone to trial on the device access fraud charge.  In any event, even if the Court were to completely disregard her 2005 plea, the Court would still conclude that Milman cannot show prejudice.[30]

Ultimately, there is not a reasonable probability that, having received correct advice about the immigration consequences of her conviction, that Milman would have rejected the plea and gone to trial.

## III.  CONCLUSION

For all these reasons, Milman's § 2255 motion and Coram Nobis Petition are DENIED.  As her motions have been denied, the Court will lift the stay of Milman's removal on January 31, 2024.   Because Petitioner has failed to make a substantial showing of the denial of any constitutional right, no certificate of appealability will issue.[31]  See 28 U.S.C. § 2253(c)(2).  The Court also certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of appeal.  Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is respectfully directed to enter judgment.

---

[30] The record from Milman's immigration proceeding includes a letter from Scharf which states that Milman received ineffective assistance of counsel in connection with her 2000 Petit Larceny plea because her defense attorney "failed to warn her of the deportation consequences of the plea."  (IR75.)  It is not clear if Milman ever actually sought to vacate the Petit Larceny plea on this ground and the record from the immigration proceedings does not contain a sworn statement from Milman concerning the circumstances of that plea.  While Milman's 2000 plea could also have potential relevance here, given the representation in Scharf's letter, the Court has not considered her 2000 Petit Larceny plea in addressing the prejudice prong.

[31] While it is not clear that the certificate of appealability requirement applies to the Court's denial of Milman's coram nobis petition, to the extent that it does, the Court finds that a certificate of appealability should be denied as to Milman's § 2255 motion and her coram nobis petition.

Because this decision cites certain documents that are currently under seal, the Court is issuing this decision under seal with copies provided to the parties. The parties may propose redactions by January 15, 2024. If the parties do not submit any proposed redactions by January 15, 2024, the Court will docket this order, in its entirety, on the public docket.

**SO ORDERED.**

Dated:  December 29, 2023
Central Islip, New York

_____/s/  (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE